UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| SARAH COLE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:05-0558 |
| | ) | Judge Trauger |
| v. | ) | |
| | ) | |
| WYNDCHASE ASPEN GROVE | ) | |
| ACQUISITION CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This matter comes before the court on a Motion for Summary Judgment filed by the defendant (Docket No. 22), to which the plaintiff has responded (Docket No. 24), and the defendant has replied (Docket No. 26). For the reasons discussed herein, the defendant's motion will be denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Sarah Cole rented an apartment from defendant Wyndchase Aspen Grove Acquisition Corporation ("Wyndchase") from January 2002 through early October 2004.[1] During this period of tenancy, water leaked into the apartment through the ceiling in several different rooms, allegedly due to problems with the building's sprinkler system. In addition, at some point, water ran out of the air-conditioning vent in the hallway and into a wall, soaking that

---

[1] Unless otherwise noted, the facts have been drawn from the plaintiff's Complaint (Docket No. 1, Ex. 2, attach. Compl.) and the plaintiff's Memorandum in Support of its Response to Defendant's Statement of Undisputed Material Facts (Docket No. 25).

1

wall and the carpet below. The defendant painted over the water stains on the ceiling and took other actions, such as bringing in fans and pulling up the carpet, in an attempt to dry out the apartment.

In August 2003, Ms. Cole began to feel ill. First, Ms. Cole experienced a lack of energy; later, she suffered from additional symptoms such as shortness of breath, inability to concentrate, burning eyes, tingling in her extremities, and pain in her teeth, jaw, and sinus areas. Ms. Cole saw a physician to determine the cause of these symptoms and underwent tests for diabetes, mononucleosis, and allergies, all of which returned negative.

On January 24, 2004, despite her illness, Ms. Cole signed a new lease agreement, renewing her tenancy in the Wyndchase building. Later that year, Ms. Cole was informed by her physician that her illness might be caused by mold in her apartment. The plaintiff reports that she told an employee of the defendant that she thought there might be mold in the apartment but that the employee had insisted there was no such mold, only "dust in the vents." (Docket No. 1, Ex. 2 at ¶ 5.) In July of that year, the defendant had a sample from her apartment tested for mold, and in August, the test returned positive, indicating that mold existed at such high levels that occupation of the apartment was hazardous. Additionally, at some point, Ms. Cole's parents visited her in Nashville and, out of concern for her illness, took samples from her apartment back to their home in Houston, Texas, to be tested for mold. (Docket No. 23, Ex. 9 at p. 2.) The samples tested positive. (*Id*. at p. 4.)

The plaintiff alleges that her parents visited during the summer of 2004 and that the test results came in during July or August of that year (Docket No. 25, Ex. 2. at p. 11). The defendant, on the other hand, citing the deposition of Ms. Cole's father, argues that this visit, and

2

the mold tests subsequently performed in Texas, occurred a year earlier, in 2003. (Docket No. 23, Ex. 9 at p. 3-4.) Whatever the chronology of these events, it was not until August 2004 that Ms. Cole informed her physician of the mold tests. Ms. Cole's physician told her that her illness was likely due to the mold problem and that she should leave the apartment immediately. That very day, on her physician's advice, Ms. Cole alleges that she moved out of the apartment, never to return. However, the defendant has provided documentation showing that, on September 27, 2004, Ms. Cole met with Amy Hanson, an employee of the defendant, to discuss the mold issue, and that Ms. Cole moved out of the apartment on or about October 9, 2004. (Docket No. 13, Ex. 13, 16.)

Of certain relevance to this case are exculpatory clauses in the January 2, 2002, and December 1, 2002, leases and additional language in the January 4, 2004 renewal. The January 2, 2002 lease agreement contained the following language:

> Materials In The Apartment Community. Resident is hereby made aware that certain materials containing potentially health-affecting substances may exist in the Premises and elsewhere in the Apartment Community (such materials hereinafter called the "Materials" . . .). Resident, by signing this Lease, understands and acknowledges that potential health hazards may exist or occur under some circumstances during Resident's occupation or use of the Premises or other portions of the Apartment Community. Being fully apprised of these facts, and as additional consideration for Manager to enter into this Lease, subject to standards required by law, *Resident hereby knowingly and voluntarily (i) waives all claims and causes of action, arising by statute, ordinance, rule, regulation or similar provision, against Manager and its Affiliates with respect to the presence and effects of the Materials, and (ii) assumes and accepts any and all risks associated with the presence and effects of the Materials and Resident waives such claims and causes of action and assumes and accepts such risks for itself, its heirs, successors, assigns, guests and all other that may claim by and through Resident*. . . .

(Docket No. 23 at p. 2.) (emphasis added). On December 1, 2002, the plaintiff signed a new lease agreement for her second year of tenancy, which contained a more specific exculpatory

3

clause:

> Mold and Mildew. Resident acknowledges that the apartment is located in Tennessee, which has a climate conducive to the growth of mold and mildew. It is therefore necessary to provide proper ventilation and dehumidification to the apartment to minimize the growth of mold and mildew. The only effective method to properly condition the air is to operate the heating and/or air conditioning ventilation system at all times throughout the year, even during those times when outside temperatures are moderate. *Please understand the management is not responsible for any injury, illness, harm or damage to this apartment or any person or property caused by or arising from, in whole or in part, mold or mildew*.

(Docket No. 23 at p. 3.) (emphasis added).

Finally, on January 4, 2004, when the plaintiff renewed her lease for the third and final time, she signed a Mold Information and Prevention Addendum, highlighting preventive steps she could take to help reduce the chances of mold growing in her living space. The Addendum is divided by helpful section headings such as "About Mold," "Preventing Mold Begins With You," and "In Order To Avoid Mold Growth," and contains the following language: "If you fail to comply with this Addendum, you can be held responsible for property damage to the apartment home and any health problems that may result. We cannot fix problems in your apartment home unless we know about them." (Docket No. 23, Ex. 12.)

On June 15, 2005, Ms. Cole filed this action, alleging that the defendant had breached its duty of care owed to her by failing to remedy a dangerous condition or warn her of its existence. (Docket No. 1, Ex. 2.) On July 18, 2005, the defendant removed the action to this court pursuant to its diversity jurisdiction. (Docket No. 1.) The defendant moved for summary judgment on May 15, 2006. (Docket No. 22.)

4

## ANALYSIS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine

5

issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

## II.     Statute of Limitations

The defendant argues that the plaintiff discovered, or should have discovered, her cause of action over a year before she filed this suit on June 15, 2005 and, therefore, that her suit is barred by the one-year statute of limitations for personal injuries set forth in T.C.A. § 28-3-104. Under Tennessee law, in all tort actions, "the cause of action accrues and the statute of limitations commences to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered." *McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d 487, 491 (Tenn. 1975); *see also Murphree v. Raybestos-Manhattan, Inc.*, 696 F.2d 459, 462 (6th Cir. 1982).

Tennessee courts have articulated the "discovery rule" in this way: "it is not necessary that the 'plaintiff actually know that the injury constitutes a breach of the appropriate legal

6

standard in order to discover that he has a 'right of action'; the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct.'" *Crafton v. Van Den Bosch*, 196 S.W.3d 767, 772 (Tenn. Ct. App. 2005) (quoting *Carvell v. Bottoms*, 900 S.W.2d 23, 29 (Tenn. 1995)). Under Tennessee's application of the discovery rule, the limitations period "is not postponed until the plaintiff becomes fully aware of all the injurious effects of the defendant's conduct," but instead, "[a] cause of action is deemed to be discovered when the plaintiff knows that he or she has been injured and who caused the injury." *Clifton v. Bass*, 908 S.W.2d 205, 209 (Tenn. Ct. App. 1995); *see also Chambers v. Dillow*, 713 S.W.2d 896, 898 (Tenn. 1986); *Foster v. Harris*, 633 S.W.2d 304, 304-05 (Tenn. 1982).

Finally, it is important to note that, under Tennessee law, "[t]he time of accrual of the cause of action, as affecting limitations, is frequently a question of fact to be determined by the jury . . . where the evidence is conflicting or subject to different inferences." *Prescott v. Adams*, 627 S.W.2d 134, 139 (Tenn. Ct. App. 1982); *see also Hamblen v. Davidson*, 30 S.W.3d 433, 438 (Tenn. Ct. App. 2001) (holding that whether or not the plaintiff should have discovered that her venereal disease had been caused by her ex-husband at an earlier date was "a matter of fact for the jury to decide").

The *Prescott* case is particularly instructive. In *Prescott*, an action for damage to the plaintiffs' home due to a faulty drainage system, the court addressed whether the plaintiffs should reasonably have been alerted to their cause of action over a year prior to their filing suit. 627 S.W.2d at 138. The trial court had held that the plaintiff could not reasonably have remained ignorant of the faulty construction in the face of telltale signs, such as "a greatly

7

reduced purchase price, notice of 'mud washes' and the installation of drains, reports of mud slides by neighbors and cracks in the ground" and, therefore, that the statutory period had expired prior to the filing of the suit. *Id*. at 139. The Court of Appeals reversed, finding that it was "inappropriate" for the trial court "to have decided this question on the basis of a motion for summary judgment." *Id*. at 138. The court explained that:

> Although the facts may not have been in dispute, a dispute did exist as to the proper interpretation of those facts. Summary judgment for the defendant is not proper where, although the basic facts are not in dispute, parties in good faith may disagree nevertheless about the inferences to be drawn from the facts.

*Id*. at 138-39. Accordingly, the court found that "a question of fact exists as to when the plaintiffs knew or should reasonably have known that a cause of action existed." *Id*. at 139; *see also Sullivant v. Americana Homes, Inc.*, 605 S.W.2d 246, 249 (Tenn. App. 1980) (holding that whether the plaintiff should have discovered that her living conditions were contributing to her asthma condition "is a fact for a jury to determine").

The Tennessee Supreme Court's decision in *Leach v. Taylor*, 124 S.W.3d 87, 90-91 (Tenn. 2004), is also pertinent. In *Leach*, the defendants, two funeral directors, made upsetting statements to the plaintiffs about the condition of a body on which they had performed work, which, after the plaintiffs had the body disinterred, turned out to be false. Although several years had passed since the defendants had made the false statements, the court held that, under the discovery rule, the limitations period should be tolled until the body was removed, and the plaintiffs discovered that, in fact, the statements were false. *Id*. at 91. Because the funeral directors were in a unique position of familiarity with the body in question, the court held that the plaintiffs were entitled to rely on the veracity of the defendants' statements until such time as those statements were actually proven false. *Id*. Until that time, under the discovery rule, the

8

limitations period was tolled. *Id*.

In the present action, there is at least a factual dispute as to when the plaintiff reasonably should have discovered her cause of action. The plaintiff alleges that, although she experienced signs of illness at a much earlier date, she was not alerted by either her physician, or the tests performed on samples from her apartment, that her illness was likely caused by mold in her apartment until July or August of 2004, putting her action well within the statutory period. The defendant alleges that the plaintiff's parents performed mold tests a year earlier, in 2003. The plaintiff, however, denies that those tests occurred in 2003. The record is not conclusive as to when those tests occurred; at this time there is a factual dispute as to that issue, which must be decided in favor of the plaintiff for the purposes of this motion.

Moreover, even if the plaintiff's parents were themselves alerted to the possibility that the plaintiff's illness was caused by mold in her apartment, that would not, in and of itself, demonstrate that the plaintiff knew or should have known that her cause of action existed. As in *Prescott*, even if there were not a factual dispute as to the chronology of events in this case, a dispute would exist as to the proper interpretation of those facts, that is, whether or not the plaintiff's symptoms and her investigations should have alerted her to her cause of action. And as in *Leach*, the plaintiff must be reasonably permitted to rely on statements from the defendant's employee that the apartment did not contain dangerous amounts of mold, but merely "dust in the vents." The defendant, as the owner and operator of an apartment complex, is in a unique position to know whether or not mold is present. Whether or not the plaintiff should have known, at an earlier date, that the defendant was responsible for her injuries is a question for the jury. Accordingly, the court cannot grant summary judgment in this case based on the running

of the statute of limitations.

**III.    Validity of the Exculpatory Clauses**

Additionally, the defendant argues that the plaintiff has waived any right to damages for her injuries pursuant to several exculpatory clauses contained in the lease agreements relating both generally to hazardous materials in the apartment building and specifically to mold-related problems. Although the clauses are, as the defendant asserts, quite clear, they are additionally unenforceable as a matter of Tennessee law. Accordingly the clauses cannot limit the plaintiff's cause of action.

An exculpatory clause in a lease agreement between landlord and tenant is "a clause which deprives the tenant of the right to recover damages for harm caused by the landlord's negligence by releasing the landlord from liability for future acts of negligence." *Crawford v. Buckner*, 839 S.W.2d 754, 755-56 (Tenn. 1992). The Tennessee Supreme Court, in *Olson v. Molzen*, 558 S.W.2d 429, 430-31 (Tenn. 1977)—while reaffirming that, "as a general rule, a party may contract against his or her own negligence"—adopted the California Supreme Court's test for determining when an exculpatory clause is void for reasons of public policy. That test directs the court to weigh the following factors:

(a.)    [Whether] [i]t concerns a business of a type generally thought suitable for public regulation.

(b.)    [Whether] [t]he party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.

(c.)    [Whether] [t]he party holds himself out as willing to perform this service for any member coming within certain established standards.

(d.)    [Whether,] [a]s a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive

10

> advantage of bargaining strength against any member of the public who seeks his services.
>
> (e.) [Whether,] [i]n exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.
>
> (f.) Finally, [whether,] as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Olson*, 558 S.W.2d at 430 (quoting *Tunkl v. Regents of University of California*, 383 F.2d 441 (1963)). While adopting those factors, the court in *Olson* stressed that "[i]t is not necessary that all be present in any given transaction, but generally a transaction that has some of these characteristics would be offensive." *Id*.

In *Crawford*, 839 S.W.2d at 756-58, the court, applying the above criteria, held that an exculpatory clause in a landlord-tenant contract was void as a matter of public policy. The court in *Crawford* addressed an exculpatory clause containing the following language:

> [t]enant agrees that the landlord, his agents and servants shall not be liable to tenant or any person claiming through tenant, for any injury to the person or loss of or damage to property for any cause. Tenant shall hold and save landlord harmless for any and all claims, suits, or judgments for any such damages or injuries however occurring.

*Id*. at 755. Although, under *Olson,* an exculpatory clause need not exhibit every factor in order to be void, the court in *Crawford* found that the above clause did, in fact, exhibit each of them, concluding, "we find that the residential landlord-tenant relationship here satisfies all six of the public interest criteria adopted in *Olsen*." *Id*. at 758. In support of its holding, the court quoted approvingly the following language from the Washington Supreme Court's decision in *McCutcheon v. United Homes Corp.*:

11

> [W]e are not faced merely with the theoretical duty of construing a provision in an isolated contract specifically bargained for by *one landlord and one tenant* as a purely private affair. Considered realistically, we are asked to construe an exculpatory clause, the generalized use of which may have an impact upon thousands of potential tenants.

486 P.2d 1093, 1097 (Wash. 1971) (emphasis in original). Finally, the court concluded that, "in the residential landlord-tenant relationship, the public policy against exculpatory clauses affecting the public interest should control lease provisions limiting a landlord's liability to its tenants." *Crawford*, 839 S.W.2d at 759.

In addition, the Tennessee legislature has delineated the public policy against exculpatory clauses in landlord-tenant contracts in T.C.A. § 66-28-203(a), which provides that "[n]o rental agreement may provide that the tenant . . . [a]grees to the exculpation or limitation of any liability of the landlord to the tenant arising under law or to indemnify the landlord for that liability or the costs connected with such liability." Further, § 66-28-203(b) provides that any such provision "is unenforceable." Accordingly, "[s]hould a landlord willfully provide a rental agreement containing provisions known by the landlord to be prohibited by this chapter, the tenant may recover actual damages sustained." *Id*.

It is beyond question that both under the *Olson* test, as applied in *Crawford*, and under T.C.A. § 66-28-203, the exculpatory clauses at issue in this case are void and do not deprive the plaintiff of her cause of action. The court finds the defendant's attempt to distinguish *Crawford* on the basis that it was decided "on the facts before it" unconvincing. All courts must decide cases based on the facts before them. This fact does not itself dissuade courts from relying on prior case law when resolving legal disputes. The *Crawford* court did not rely on the breadth of the clause at issue, but rather on its application to the specific factors set forth in *Olson*;

12

therefore, its analysis applies equally to clauses seeking to exculpate a landlord for only certain kinds of harm, such as harm due to dangerous levels of mold in an apartment.

Specifically, as in *Crawford*, the clause concerns a business generally thought suitable for public regulation—housing—which is also a matter of great import to the public and is, in fact, a matter of public necessity. The defendant, a corporation that owns the housing complex at issue, holds itself out as willing to perform its service—providing living space—for members of the public who meet established standards and, as a result, possesses a decisive advantage in bargaining with the public. As such, it has confronted the public—and specifically the plaintiff—with several standardized adhesion contracts, each containing exculpatory clauses, with no mechanism by which the plaintiff could bargain for additional protection against negligence. Finally, as in *Crawford*, the plaintiff's person and property have been placed under the control of the defendant during her period of tenancy under its roof. Not one of the *Olson* factors asks the court to examine the breadth or narrowness of the clause at issue; accordingly, as in *Crawford*, each factor has been met in this case. Neither does T.C.A. § 66-28-203 limit itself to broad exculpatory clauses. Whether the clause is broad or narrow, under § 66-28-203 it is void. Under Tennessee law, therefore, the exculpatory clauses are unenforceable, and the plaintiff has not waived any right to recovery.

## **CONCLUSION**

For the reasons stated herein, the defendant's Motion for Summary Judgment will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge